## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

HACKENSACK RIVERKEEPER, INC., and
RIVERKEEPER, INC.,
          Plaintiffs,

v.

ROCKLAND COUNTY SOLID WASTE
MANAGEMENT AUTHORITY,
          Defendant.

------------------------------------------------------------

Case No.  7:25-cv-6565

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution
Control Act, 33 U.S.C. §§ 1251
to 1387)

Plaintiffs Hackensack Riverkeeper, Inc. ("Hackensack RK") and Riverkeeper, Inc. ("Riverkeeper") (together, "Plaintiffs"), by and through their counsel, hereby allege:

## I.

## INTRODUCTION

1.    This action is brought under the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"), to address and abate Defendant's ongoing and continuous violations of the Act.

2.    Defendant discharges polluted industrial stormwater from several waste processing facilities (collectively referred to as the "Facilities") located throughout Rockland County into waters of the United States in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p); the New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-23-001 (March 8, 2023), Permit No. GP-0-17-004 (Mar. 1, 2018) (the "MSGP"); and the New York State Department of Environmental Conservation SPDES General

Permit for Stormwater Discharges from Municipal Separate Storm Sewer Systems (MS4s),

Permit No. GP-0-15-003 (May 1, 2015) (the "MS4 Permit").

3.      Defendant's violations of the Clean Water Act include: discharges of polluted

stormwater and other pollution that are not and have not been authorized by either the MSGP or

the MS4 Permit; inadequate pollution control measures and pollution prevention plans; failure to

take corrective actions in the face of continuous and ongoing benchmark and water quality

standard exceedances; and failure to comply with inspection and monitoring requirements set

forth in the MSGP and/or the MS4 Permit.

4.      Stormwater runoff is one of the most significant sources of water pollution in the

nation—comparable to, if not greater than, contamination from industrial and sewage sources.

With every rainfall event, hundreds of millions of gallons of polluted stormwater pour into the

Hackensack River, Passaic River, DeForest Lake, Hudson River, and other receiving waters in

this District. The State of New York has designated as "impaired" more than 7,000 river miles;

319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of

coastal shoreline; and 592 miles of Great Lakes shoreline. Under the Clean Water Act,

"impaired" means not meeting a state's water quality standards and/or unable to support

beneficial uses, such as fish habitat and water contact recreation. In many of these waters, state

water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion,

inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently

exceeded. For the overwhelming majority of water bodies listed as impaired, stormwater runoff

is cited as a primary source of the pollutants causing the impairment.

5.      Stormwater discharges from Defendant's Facilities contribute to this endemic

stormwater pollution problem. Defendant engages in industrial activities involved in solid waste

processing, including receiving and sorting solid waste for processing or transfer; processing

organic waste into mulch and/or compost; and crushing and screening concrete and asphalt. As

precipitation comes into contact with pollutants generated by these industrial activities, it

conveys those pollutants to nearby waters. Contaminated stormwater discharges such as those

from Defendant's industrial waste processing facilities can and must be controlled to the fullest

extent required by law to allow these water bodies a fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the parties and this action pursuant

to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and

28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is

authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual

controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b),

1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

7.      On May 30, 2025, Plaintiffs provided notice of Defendant's violations of the Act

and of its intention to file suit against Defendant to Defendant; the Administrator of the United

States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the

Commissioner of the New York Department of Environmental Conservation ("DEC"), as

required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the

corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3 ("Notice Letter"). A true and correct

copy of Plaintiffs' Notice Letter is attached as Exhibit A, and is incorporated herein by reference.

8.     More than sixty days have passed since the notice letter was served on Defendant and the State and federal agencies. Plaintiffs have complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

9.     Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

10.     This action is not barred by any prior administrative penalty action under CWA Section 309(g), 33 U.S.C. § 1319(g).

11.     Venue is proper in the United States District Court for the Southern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

## III.

## PARTIES

12.     Plaintiff Hackensack Riverkeeper, Inc. ("Hackensack RK") is a non-profit corporation whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hackensack River and its watershed through enforcement, field work, and community action. Hackensack RK's mission includes safeguarding the environmental, recreational, and commercial integrity of the Hackensack River and its ecosystem, including the Hackensack and Passaic River deltas in Newark Bay. It achieves its mission through public education, advocacy for sound public policies, and participation in legal and administrative forums. To further its mission, Hackensack Riverkeeper actively seeks federal and state implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its supporters.

13.     Hackensack RK has approximately 350 supporters in the New York and New Jersey region, many of whom use and enjoy the waters of Newark Bay and its tributaries—including the Hackensack River and the Passaic River—which are polluted by industrial stormwater runoff from three of the Defendant's Facilities.

14.     Plaintiff Riverkeeper, Inc. ("Riverkeeper") is a non-profit corporation whose mission is to protect and restore the Hudson River from source to sea and safeguard drinking water supplies through advocacy rooted in community partnerships, science, and law. Riverkeeper achieves its mission through public education, advocacy for sound public policies, and participation in legal and administrative forums. To further its mission, Riverkeeper actively seeks federal and state implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

15.     Riverkeeper has approximately 2,100 members in the New York and New Jersey region, many of whom use and enjoy the Hudson River, New York Harbor, and their tributaries, which are polluted by industrial stormwater runoff from the Defendant's Facilities.

16.     Plaintiffs' members reside near to, use and enjoy the waters which are polluting. Plaintiffs' members use those areas to fish, crab, sail, boat, canoe, kayak, swim, birdwatch, photograph, observe wildlife, study nature and the sciences, and engage in spiritual and religious practices, among other activities. Defendant's discharges of stormwater associated with industrial activity containing pollutants impair each of those uses. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the MSGP.

17.     The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendant's activities. Continuing commission of the acts and omissions alleged

herein will irreparably harm Plaintiffs and their members, for which harm they have no plain, speedy, or adequate remedy at law.

18.    Plaintiffs bring this action on behalf of their members, respectively. Plaintiffs' interest in reducing Defendant's discharge of pollutants into the aforementioned local waters and requiring Defendant to comply with the requirements of the MSGP are germane to Plaintiffs' purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Plaintiffs.

19.    Plaintiffs are informed and believe, and thereupon allege, that Defendant Rockland County Solid Waste Management Authority (commonly known as "Rockland Green") is a public benefit corporation created by the Rockland County Legislature that owns and/or operates the following industrial facilities.

    a.   Clarkstown Campus Facility, located at 166 South Route 303, West Nyack, NY 10994 ("Clarkstown Facility").

    b.   French Farms Yard Waste Composting Facility, located at 226 Brewery Road, New City, NY 10956 ("French Farms Facility").

    c.   Hillburn Facility, located at 400-420 Torne Valley Road, Hillburn, NY 10931 ("Hillburn Facility").

    d.   West Haverstraw Facility, located at 200 Beach Road, Haverstraw, NY 10993 ("West Haverstraw Facility").

**IV.**

**STATUTORY AND REGULATORY BACKGROUND**

**The Clean Water Act**

20.    Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C.

§ 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

21.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. A NPDES permit requires dischargers of pollution to comply with various limitations.

22.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA. CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

23.     In New York, DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

24.     The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution. *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

25.     The Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants, permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all

pollutants . . . ." 33 U.S.C. § 1311(b)(2)(A) (i.e., the "BAT" standard). The Act also sets a

different standard, "application of the best conventional pollutant control technology" for a

defined set of five "conventional pollutants." *Id.* § 1311(b)(2)(E)[1] (i.e., the "BCT" standard)

(together, the "BAT/BCT Standard"). *See also* 40 C.F.R. § 122.44(a) (requiring that each

NPDES permit shall include conditions that meet the Act's technology-based standards).

26.     The Clean Water Act further requires any NPDES permit issued by a state to

contain any additional limits necessary to ensure compliance with that state's water quality

standards. *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent

limitation, including those necessary to meet water quality standards"), 1342(b)(1)(A) (requiring

compliance with "any applicable requirements" of 33 U.S.C. § 1311). *See also* 40 C.F.R.

§ 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve

a state's water quality standards).

**Stormwater Permits**

27.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress

enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial

Stormwater Discharges."

28.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated

stormwater discharge regulations at 40 C.F.R. § 122.26. In promulgating those regulations, EPA

cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and

coastal areas across the nation. In particular, EPA found that runoff from industrial facilities

contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40
CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform,
and oil and grease.

runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants. 55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

29.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

30.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York. *SPDES Multi-Sector MSGP For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-23-001 (March 8, 2023) ("2023 MSGP"), Permit No. GP-0-17-004 (Mar. 1, 2018) ("2018 MSGP"), Permit No. GP-0-12-001 ("2012 MSGP") (generally, the "MSGP").[2]

31.     As a state-issued, delegated NPDES permit, the MSGP requires permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the BAT/BCT Standard. *See* MSGP, Part II (requiring permittees to minimize pollution by adopting measures that are "technologically available and economically practicable and achievable in light of best industry practice").

32.      As relevant here, DEC also elected to issue a statewide general permit for stormwater discharges from small municipal separate storm sewer systems ("MS4s") in New York. *SPDES MSGP for Stormwater Discharges from Municipal Separate Storm Sewer Systems (MS4s)*, GP-0-15-003 (May 1, 2015) ("2015 MS4 Permit"), GP-0-24-001 (Jan. 3, 2024) ("2024 MS4 Permit") (generally, the "MS4 Permit").

**The MS4 Permit Framework**

33.     The 2015 MS4 Permit regulated industrial stormwater discharges via the MS4 by

---

[2] The 2023 MSGP is substantially similar to the 2018 MSGP, including structure of MSGP Parts. Hereinafter, unless specifically noted, references and citations to the MSGP or an MSGP Part include reference and citation to both the 2023 MSGP and the 2018 MSGP.

industrial facilities owned or operated by the permittee. The 2015 MS4 Permit required such facilities to, at minimum, comply with various provisions of the MSGP then in effect, including but not limited to the requirement to implement Stormwater Pollution Prevention Plans ("SWPPPs"), conduct routine inspections, and monitor stormwater discharges.

34.    Part VII.A.6.a.viii of the 2015 MS4 Permit required permittees that would otherwise be subject to the MSGP to develop and implement a SWPPP and conduct monitoring and reporting by complying with the 2012 MSGP, *inter alia*, Parts III. A, C, and D, and Part IV.

35.    Part III.A of the 2012 MSGP required permittees to develop and implement a SWPPP in accordance with good engineering practices and minimize the pollutants in industrial stormwater. It defines minimize as to "reduce and/or eliminate to the extent achievable using control measures (including BMPs) that are technologically available and economically practicable and achievable in the light of best industry practice."

36.    Part III.C of the 2012 MSGP set forth various requirements for the contents of a SWPPP, including, *inter alia*, the pollution prevention team, a summary of potential pollutant sources, a site map, and various stormwater controls. Part III.D of the 2012 MSGP required that permittees sign the SWPPP and make it available on site or to the public upon written request.

37.    Part IV of the 2012 MSGP set forth monitoring and recordkeeping requirements including annual comprehensive site inspections, annual dry weather monitoring, quarterly visual monitoring, monitoring of secondary containment structures, and benchmark monitoring (including heightened benchmark monitoring frequency for discharges to impaired waters).

38.    The 2018 MSGP and 2023 MSGP contain the same requirements as those set forth in Part III. A, C, D and Part IV of the 2012 MSGP, as described further below.

39.    Part VI.E of the 2015 MS4 Permit required that permittees "must comply with all

applicable technology-based effluent standards or limitations promulgated by EPA pursuant to Sections 301 and 304 of the CWA" and "[i]f an effluent standard or limitation more stringent than any effluent limitation in the [MS4 Permit] or controlling a pollutant not limited in the permit is promulgated or approved after the permit is issued, the [storm water management] plan shall be promptly modified to include that effluent standard or limitation."

40.    The 2024 MS4 Permit no longer authorizes discharges of stormwater associated with industrial activities. Accordingly, as of January 3, 2024, industrial facilities owned or operated by MS4 operators are required to obtain coverage under the MSGP.

### The MSGP Framework

41.    The MSGP ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions. All of the MSGP's conditions constitute enforceable "effluent standards or limitations" within the meaning of the CWA's citizen suit provision. 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title").

42.    At the outset, the MSGP establishes eligibility conditions that permittees must meet to obtain coverage. MSGP, Part I. Permittees apply for coverage under the MSGP by submitting an application called a Notice of Intent. MSGP, Part I.D.

43.    Among other things, when submitting a Notice of Intent, the applicant must identify the specific outfalls through which it will discharge industrial stormwater. A permittee may only lawfully discharge stormwater associated with industrial activity from these outfalls. MSGP, Parts I.D.3, I.F.

44.    Next, the MSGP contains a variety of substantive limits that all permittees must meet. MSGP, Part II. These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and compulsory pollution

control and minimization practices. MSGP, Part II.

45.    In addition, the MSGP contains effluent limitations that apply only to permittees engaged in particular industrial activities. *See* MSGP, Part VII. Although permittees may have a primary industrial activity occurring at their site, they are required to comply with all conditions pertaining to any other industrial activities occurring at their facility too, referred to as "co-located" activities. *Id.* ("Stormwater discharges from co-located industrial activities are authorized by this permit, provided that the owner or operator complies with any and all of the requirements applicable to each industrial activity at the facility.").

46.    The MSGP thus implements the BAT/BCT standard through a combination of general and sector-specific effluent limitations that require the Facility to "minimize" the discharge of pollutants. *See* MSGP, Part II; Part VII. The MSGP defines "minimize" as requiring operators to "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." MSGP, Appendix A.

47.    Permittees typically meet the MSGP's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting "best management practices" ("BMPs") and other stormwater control measures. BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).

48.    The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits

contained in the MSGP. *See, e.g.*, MSGP, Part II (outlining mandatory BMPs), Part VII (outlining sector-specific BMPs), Part III.A.7 (requiring documentation of all BMPs installed and implemented at the facility pursuant to Parts II and VII, documentation of all innovative BMPs, and an explanation of any BMPs that have not been installed due to site-specific conditions).

49.     A permittee must record the BMPs and control measures used to meet the MSGP's limits in a "stormwater pollution prevention plan" ("SWPPP"). MSGP, Part III. The permittee must develop, implement, and continually update this plan to adapt it to changing conditions at the facility. *Id.* The SWPPP must address all of the permittee's industrial activities and meet all other requirements for such plans set forth in the MSGP. *Id.* Further, the SWPPP must be developed and fully implemented before an applicant is eligible to discharge industrial stormwater under the MSGP—a fully implemented SWPPP is a precondition of coverage. *Id.*, Part I.D.1.a.

50.     To ensure compliance, adequacy, and functioning of the SWPPP and selected BMPs, permittees must track, improve upon, and report upon their performance under the MSGP. *See id.*, Parts IV–VII.

51.     The MSGP requires regular inspections by qualified personnel, including annual comprehensive inspections and quarterly routine inspections, to evaluate the performance and maintenance needs of BMPs, detect leaks, and document any deficiencies in the implementation and/or adequacy of the SWPPP, amongst other things. *Id.*, Parts IV.A–C; *see also id.*, Parts II.A.2–3.

52.     The MSGP also requires monitoring of stormwater discharges, including quarterly visual monitoring and periodic sampling for pollutants associated with the facility's industrial

sector. *Id.*, Parts IV.D–G, VII. The MSGP relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" (known as "benchmarks") for pollutants of concern in a given industry to ensure that permittees are minimizing pollution and complying with the narrative limits set forth in the MSGP. *See id.*, Part VII (adopting sector-specific benchmarks for each category of permittees).

53.    A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." *Id.*, Appendix A. As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995). Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

54.    Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the MSGP and the federal technology and water-quality based standards that it implements. Although compliance with benchmarks under the MSGP is self-reported, self-monitoring reports under the MSGP are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds* 485 U.S. 931 (1988).

55.    If an inspection or monitoring sample reveals an exceedance, violation, or other issues with the BMPs or the SWPPP, the permittee is required to take and document corrective actions. MSGP, Part V.

56.    The results of a permittee's inspections and monitoring must be documented and kept with the SWPPP, and certain reports must be submitted to DEC on a periodic basis. MSGP,

Part VI. This self-reporting is the primary means by which DEC and EPA ensure a facility complies with the MSGP and the Clean Water Act.

### Key Conditions of the MSGP

57.     Within that framework, the following specific conditions of the MSGP are particularly relevant in this case.

#### Generally Applicable BMP Requirements

58.     As outlined above, the MSGP requires all permittees to implement certain BMPs to minimize the exposure of potential sources of pollution to stormwater to the greatest extent possible, so as to meet the federal BAT/BCT Standard. MSGP, Part II.A. These BMPs are referred to as Non-Numeric Technology Based Effluent Limitations (herein, "NNELs").

59.     The NNELs that are generally applicable to all permittees include: (1) minimizing exposure of industrial areas to stormwater and stormwater runoff; (2) good housekeeping; (3) maintaining all industrial equipment and stormwater controls in effective operating condition; (4) developing a spill prevention and response plan; (5) minimizing onsite erosion and sedimentation; (6) reducing all stormwater discharges from the facility; (7) managing salt and deicing materials; (8) training all employees, at least annually, in appropriate stormwater control and SWPPP implementation; (9) eliminating non-stormwater discharges; (10) controlling waste, garbage, and other floatable debris; (11) minimizing generation of off-site pollutants, such as dust; and (12) ensuring compliance with all regulations concerning storage of petroleum, chemicals, and hazardous wastes. MSGP, Part II.A.

60.     As to the NNEL for good housekeeping, the MSGP requires permittees to "keep clean all exposed areas that are potential sources of pollutants," with specific requirements for regular sweeping or washing of the facility and container management. MSGP, Part II.A.2.

61.     As to the NNEL for erosion and sediment controls, the MSGP requires permittees

to stabilize all exposed areas and control stormwater runoff using erosion and sediment controls in accordance with the New York State Standards & Specification for Erosion & Sediment Control (or equivalent). MSGP, Part II.A.5.

62.     As to the NNEL for controlling waste and floatable debris, the MSGP requires permittees to prevent any discharge of such material in surface waters of the state by keeping exposed areas clear of waste or by intercepting them prior to discharge. *Id*., Part II.A.10.

63.     As to the NNEL for minimizing generation of off-site pollutants, the MSGP requires permittees to "[m]inimize the *generation* of dust and *off-site tracking* of raw, final, or waste materials." *Id.*, Part II.A.11 (emphasis added). In other words, permittees are required to prevent dust from being created in the first instance, and furthermore must ensure that vehicles exiting the property do not track pollutants into the surrounding environment.

<u>Generally Applicable SWPPP Requirements</u>

64.     Part III of the MSGP requires SWPPPs to "document[] the practices and procedures to ensure compliance with the conditions of [the MSGP], including the selection, design, installation and maintenance of control measures selected to meet effluent limitations in Parts II and VII [of the MSGP]."

65.     Specifically, the SWPPP must (1) identify the persons responsible for SWPPP implementation and their contact information (the "Pollution Prevention Team"); (2) contain a general site description; (3) identify potential pollutant sources; (4) clearly identify potential or past spills or releases of non-stormwater; (5) contain a general location map that identifies receiving waters; (6) contain a detailed site map; (7) document the location and type of all BMPs installed and implemented at the facility; (8) a summary of all monitoring and sampling data; and (9) documentation related to inspections, monitoring and reporting, corrective actions, and

correspondence with DEC. MSGP, Part III.A.1–12.

66.    As to identifying potential pollutant sources, the MSGP outlines specific criteria for identifying potential sources of pollution and defines the information that must be included in the SWPPP regarding each separate area identified as a potential source. MSGP, Part III.A.3.

67.    As to BMPs, MSGP Part III.A.7, the SWPPP must describe and ensure the implementation of BMPs that minimize the discharge of pollutants in stormwater and that assure compliance with the terms and conditions of the MSGP, including effluent limitations. *Id.* As explained above, this includes both generally applicable and sector-specific non-numeric effluent limitations ("NNELs"). *Id.*, Parts II & VII. The SWPPP must explain why any BMPs required by the MSGP have *not* been installed. *Id.*, Part III.A.7. The SWPPP must also describe procedures for inspections and maintenance of BMPs, as well as employee training for proper implementation of BMPs. *Id.*, Part III.A.7.b–d.

68.    In addition to these broad BMP requirements, the MSGP also narrowly requires the SWPPP to "describe BMPs selected to eliminate discharges of solid materials, including waste, garbage and floating debris, to surface waters of the State," MSGP, Part III.A.7.g, and to "describe BMPs selected to minimize off-site vehicle tracking of raw, final, or waste materials or sediments, and the generation of dust," *id.*, Part III.A.7.h.

69.    As for structural BMPs, the MSGP requires the SWPPP to "describe BMPs selected to stabilize exposed areas and contain runoff using structural and/or non-structural control measures to minimize onsite erosion and sedimentation, and the resulting discharge of pollutants," MSGP, Part III.A.7.i. This requires the SWPPP to identify certain erosive areas at a facility as well as implement corresponding BMPs.

70.    As for structural BMPs, the MSGP also requires the SWPPP to "describe the

traditional stormwater management practices (permanent structural BMPs) that currently exist or that are planned for the facility." MSGP, Part III.A.7.j.

71.     If a spill or release of non-stormwater occurs, MSGP Part III.A.4, the owner or operator is required to notify the DEC Regional Waste Manager of the unauthorized non-stormwater discharge, begin immediate actions to eliminate the discharge, and then document these actions in the SWPPP. *Id.*, Part V.B.1.a.(1). The SWPPP must maintain a list of all reportable spills or releases of unauthorized non-stormwater discharges that "may adversely affect water quality" back to three years prior to submission of the NOI. *Id.*, Part III.A.4.b. Following any such spill or release, a facility is required to evaluate the adequacy of BMPs in the SWPPP and, if inadequate, update the SWPPP to identify new BMPs to prevent the reoccurrence. MSGP, Part III.A.4.c.

72.     As to the detailed site map, MSGP Part III.A.6, an adequate SWPPP site map must identify, *inter alia*, buildings and impervious surfaces; outfalls and drainage areas; arrows showing the direction of stormwater flow and any structural conveyances of flow; locations of any potential pollutant source (identified per the criteria set forth at MSGP, Part III.A.3); and the locations of the following areas, *inter alia*, if exposed to precipitation or stormwater run-on: fueling stations and liquid storage tanks, loading and unloading areas, storage and transfer areas, maintenance areas, locations where major spills or leaks have occurred, and all existing structural BMPs. MSGP, Part III.A.6.

73.     The MSGP requires that the SWPPP must be amended when, *inter alia*, stormwater monitoring reveals that a facility's BMPs are ineffective in eliminating or significantly minimizing pollutants from potential pollutant sources. 2023 Permit, Part III.E.2; see also 2018 Permit, Part III.E.2.

Sector-Specific BMP and SWPPP Requirements

74.    As outlined above, Sector VII of the MSGP sets forth additional NNELs based on a particular facility's sector of industrial activity. Following are select NNELs that are specifically relevant to this action.

75.    As to Sector A, with industrial activities related to Timber Products, permittees are specifically required to limit the discharge of wood debris, minimize leachate generated from decaying wood material, and minimize generation of dust. MSGP, Part VII.A, *Additional NNELs*, *Good Housekeeping*. In addition, the SWPPP must detail "temporary and permanent structural and vegetative measures that will be used to control erosion and sedimentation from areas at the facility." *Id.*, *Erosion and Sediment Control Plan*. The SWPPP site map must identify, *inter alia*, all processing areas. *Id.*, *SWPPP Requirements in Addition to Part III*.

76.    As to Sector C, with industrial activities related to Chemical and Allied Products, permittees are specifically required to design a SWPPP that sets forth a schedule for regular pickup and disposal of waste materials (or adopt other procedures to reduce potential for discharge of stormwater that has come in contact with such material) and for routine inspections of containers for potential leaks. MSGP, Part VII.C, *Additional NNELs*, *Good Housekeeping*. The SWPPP must also describe (and identify on the site map) all processing and storage areas. *Id.*, *SWPPP Requirements in Addition to Part III*.

77.    As to Sector N, with industrial activities related to scrap and waste recycling, permittees are divided into subsectors; as relevant here, Subsector N-1 concerns facilities engaged in collecting and processing source-separated recyclables, while Subsector N-3 concerns facilities engaged in collecting and processing unsorted materials for recycling. MSGP, Part VII.N, *Subsectors Descriptions*.

78.     As to all Sector N facilities, permittees are specifically required to minimize contact of residual liquids or particulate matter with stormwater; to minimize contact of stockpiled material, processed material, or non-recyclable waste with stormwater; to minimize stormwater contamination in loading and unloading areas; and to minimize stormwater contamination from equipment or container failures. MSGP, Part VII.N, *Additional NNELs, Minimize Contact of Particulate Matter*; *id.*, *Stockpiled materials, processed materials, and Non-Recyclable Wastes*; *id.*, *Residual Liquids & Fluids*; *id.*, *Spill and Leak Prevention*. The SWPPP must document consideration of a range of specific BMPs related to those requirements. *Id.*, *SWPPP Requirements in Addition to Part III*. The SWPPP site map must identify, *inter alia*, all scrap and waste material storage areas as well as areas where materials are sorted, transferred, and stockpiled. *Id.*

79.     As to spill prevention and control at all Sector N facilities, the SWPPP must set forth procedures for immediate containment and cleanup of spills and leaks, specify cleanup procedures related to the use of dry absorbents, and document consideration of overfill protection devices. MSGP, Part VII.N, *Additional NNELs*, *Spill and Leak Prevention*.

80.     As to Subsector N-1, unless the permittee provides the public with totally enclosed drop off containers at all times, the SWPPP must describe measures implemented to either (a) prevent the discharge of contaminated stormwater from drop off containers or (b) provide screening and monitoring measures in accordance with MSGP, Part IV.F.1.e, for secondary containment at storage and transfer areas. MSGP, Part VII.N, *Additional Sub-sector specific NNELs*, *Subsectors N-1 and N-2*, *Inbound Waste Control Program*.

81.     As to Subsector N-3, permittees are specifically required to design and implement an inbound recyclable and waste control program, which must include "provisions for

information/education flyers, brochures and pamphlets to suppliers of scrap and recyclable waste materials" on processes for safe waste management (such as hazardous waste disposal); procedures for certification by suppliers that such processes were followed; and procedures for inspection of inbound shipments to ensure that such processes were followed. MSGP, Part VII.N, *Additional Sub-sector specific NNELs*, *Subsectors N-3 and N-4*, *Inbound Recyclable & Waste Control Program*.

82.    As to Subsector N-3 pollution controls, permittees are required to install specific technologies for control of residual fluids and to minimize contact of fluids with stormwater and to minimize contact of scrap processing equipment with stormwater. *Id.*, *Subsectors N-3 and N-4*, *Inbound Recyclable & Waste Control Program*; *id.*, *Residual Fluids*; *id.*, *Scrap & Recyclable Waste Processing Areas*.

83.    As to Subsector N-3 SWPPPs, in addition to documenting the foregoing programs and controls, the SWPPP must document consideration of a range of specific BMPs related to lead batteries, residual fluids, and scrap processing equipment. *Id.*, *Lead Battery Program*; *id.*, *Residual Fluids*; *id.*, *Scrap & Recyclable Waste Processing Areas*.

<u>Monitoring and Reporting</u>

84.    The MSGP requires permittees to regularly monitor stormwater discharges from the Facilities, inspect stormwater controls and BMPs, take corrective actions as needed, and submit complete and accurate semi-annual and annual reports of these activities to DEC. MSGP, Parts IV, VI; *see also* 2023 MSGP, Appxs. C, D, F, G.8–9; 2018 MSGP, Appxs. C, D, G, H.8–9.

85.    The MSGP requires permittees to regularly (at least quarterly) visually monitor stormwater discharges for pollution (e.g., color and clarity; solids; foam or oily sheens; odor; or other indicators). MSGP, Part IV.E. A summary of the results of visual monitoring is reported to

DEC annually in the facility's Annual Certification Report ("ACR"). *Id.*, Part VI.A.1.

86.    In addition, the MSGP requires that the permittee regularly (at least semi-annually, *i.e.* at least twice per year) submit a stormwater discharge sample for laboratory analysis and compare the results to the benchmark for each pollutant of concern. MSGP, Part IV.F.2. The results of analytical monitoring are reported to DEC for each monitoring period (at least semi-annually) in a Discharge Monitoring Report ("DMR"). *Id.*, Part IV.F.3.d.

87.    The MSGP's monitoring requirements establish that "[e]ach outfall must be sampled" and that "[a] sample must be taken of the stormwater discharge resulting from a qualifying storm event with at least 0.1 inch of precipitation." MSGP, Part IV.D.1; *see also id.*, Part IV.F.3.a ("Monitoring of stormwater discharges associated with industrial activity from each outfall must be performed and documented. . ."). Permittees are required to document storm events during which any monitoring (analytical or visual) occurs and to maintain this documentation with the SWPPP. MSGP, Part IV.D.2.

<u>Sector-Specific Benchmarks</u>

88.    As outlined above, Sector VII of the MSGP establishes benchmarks for monitoring based on a particular facility's sector of industrial activity and the pollutants of concern in that industry. Following are benchmarks that are specifically relevant to this action.

89.    Sector A facilities with activities under SIC Code 2499 (Wood Products, Not Elsewhere Classified) are subject to the following benchmarks: COD – 120 mg/L, and TSS – 100 mg/L. *Id.*, Table VII-A-2.

90.    Sector C facilities with activities under SIC Code 2875 (Fertilizers, Mixing Only), are subject to the following benchmarks: total nitrogen ("N") – 6 mg/L; Fe – 1 mg/L; Pb – 69 µg/L; Zn – 110 µg/L; and total phosphorus ("P") – 2 mg/L. *Id.*, Table VII-C-2.

91.     Sector N (Subsector N-3) facilities with activities under Standard Industrial Classification ("SIC") Code 5093 (Scrap and Waste Materials) are subject to the following benchmarks: total suspended solids ("TSS") – 100 mg/L; chemical oxygen demand ("COD") – 120 mg/L; oil and grease ("O&G") – 15 mg/L; total recoverable aluminum ("Al") – 750 µg/L; total recoverable cadmium ("Cd") – 1.8 µg/L; total chromium ("Cr") – 1.8 mg/L, total recoverable copper ("Cu") – 12 µgL; total recoverable iron ("Fe") – 1 mg/L; total recoverable lead ("Pb") – 69 µg/L; and total recoverable zinc ("Zn") – 10 µg/L. MSGP, Table VII-N-2.

### Corrective Actions

92.     The MSGP requires permittees to take "corrective actions" in certain instances. Required corrective actions include, *inter alia*, inspecting a facility for potential sources of pollution; implementing additional non-structural and/or structural BMPs to prevent recurrence; and revising and/or updating the SWPPP. MSGP, Parts V.A–B.

93.     Part V.A of the MSGP requires corrective actions when, *inter alia*, "the quarterly visual monitoring indicates the presence of pollution or when the benchmark or numeric effluent limitation monitoring sample results indicate exceedances of the pollutants." *See also* 2023 Permit, Parts IV.E.5, F.3.c; 2018 Permit, Parts IV.E.6, F.3.c(1).

94.     Corrective actions are also required if there is evidence indicating that stormwater discharges "are causing, have the reasonable potential to cause, or are contributing to a violation of the water quality standards." MSGP, Part II.C.1.b.

95.     Part V.B of the MSGP requires corrective actions if a non-stormwater discharge is discovered. *See also* MSGP, Part IV.C.3.

96.     A failure to take required corrective actions is a violation of the MSGP, Part V.

97.     For stormwater discharges, the implementation of required corrective actions

must be completed before the next anticipated storm event, if practicable, but not more than 12 weeks after discovery (unless specific written approval for a longer schedule has been granted by DEC). MSGP, Part V.A.2. If exceedances continue, the permittee must continue implementing additional BMPs until monitoring results are satisfactory. *Id.*, Part V.A.4.

98.    For non-stormwater discharges, corrective actions must immediately be taken to eliminate the discharge, which actions must be documented in the SWPPP. MSGP, Part V.B.

99.    Permittees must document the existence of conditions requiring corrective actions within 24 hours of becoming aware of such conditions. Permittees must keep such corrective action documentation with their SWPPP. MSGP, Part V.C.

## Beneficial Uses of New York Surface Waters

100.    DEC has classified the waterbodies relevant to this lawsuit as Class A, Class B, Class C, and Class SB. As required by the Clean Water Act, New York has established water quality standards sufficient to support each class's designated uses.

101.    As to Class A, designated uses include water supply for drinking, water supply for culinary or food processing purposes, primary and secondary contact recreation, and fishing. 6 NYCRR § 701.6(a). Such waters must also be suitable for fish, shellfish, and wildlife propagation and survival. *Id*.

102.    As to Class B, designated uses include primary and secondary contact recreation and fishing. 6 NYCRR § 701.7. Such waters must also be suitable for fish, shellfish, and wildlife propagation and survival. *Id.*

103.    As to Class C, the "best usage" is fishing, though such waters should also be suitable for primary and secondary contact recreation. 6 NYCRR § 701.8. Such waters must be suitable for fish, shellfish, and wildlife propagation and survival. *Id.*

104.    As to Class SB, designated uses include primary and secondary contact recreation

and fishing. 6 NYCRR § 701.11. Such waters must also be suitable for fish, shellfish, and wildlife propagation and survival. *Id.*

105.    New York's water quality standards set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and hundreds of others. *See generally* 6 N.Y.C.R.R. §§ 702, 703 (outlining quantitative and qualitative standards, respectively). A waterbody must meet applicable numeric and narrative criteria in order to support its designated uses. *See id.* §§ 702.2, 702.9.

<u>Applicable Numeric and Narrative Water Quality Standards</u>

106.    For Class A, Class B, and Class C waterbodies, New York sets the following water quality standards for toxic and other deleterious substances: copper – 13.4 µg/L (Aquatic (Acute)) ("(A(A)"); lead – 97.1 µg/L (A(A)); zinc – 117 µg/L (A(A)); and cadmium – 3.8 µg/L (A(A)). 6 NYCRR § 703.5(f), tbl. 1.[3]

107.    For Class A waterbodies, New York sets the following additional water quality standards for toxic and other deleterious substances: iron – 300 µg/L (Aesthetic (Water Source)); lead – 50 µg/L (Health (Water Source)); and cadmium – 5 µg/L (Health (Water Source)). *Id.*

108.    For Class SB waterbodies, New York sets the following water quality standards for toxic and other deleterious substances: copper – 4.8 µg/L (A(A)); and lead – 204 µg/L (A(A)). *Id.*

109.    As to dissolved oxygen ("DO"), New York sets the following water quality standard for Class A, Class B, and Class C (nontrout) waterbodies: "the minimum daily average

---

[3] The A(A) values for copper, lead, zinc, and cadmium are based on hardness and assume a hardness of 100 ppm.

[DO concentration] shall not be less than 5.0 mg/L, and at no time shall the DO concentration be less than 4.0 mg/L." As to Class SB waters, the DO concentration "[s]hall not be less than a daily average of 4.8 mg/L." 6 NYCRR § 703.3.

110.    New York has also established the following narrative water quality standards, each of which apply to Class A, Class B, Class C, and Class SB waters:

a.    as to taste, odor, and color: "[n]one in amounts that will adversely affects the taste, color or odor thereof, or impair the waters for their best usages";

b.    as to suspended solids, "[n]one from sewage, industrial wastes or other wastes that will cause deposition or impair the waters for their best usages";

c.    as to oil and floating substances, "[n]o residue attributable to sewage, industrial wastes or other wastes, nor visible oil film nor globules of grease"; and

d.    as to phosphorus and nitrogen. "[n]one in amounts that will result in growths of algae, weeds and slimes that will impair the waters for their best usages."

## CWA Citizen Enforcement Suits

111.    Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

112.    Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342. CWA Section 505(f), 33 U.S.C. § 1365(f).

113.    Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

114.    Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

115.    Violators of the Clean Water Act are also subject to an assessment of civil penalties of up to $66,712 per day per violation. CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### Defendant's Facilities and Industrial Stormwater Discharges

116.    On information and belief, Defendant has operated the four Facilities at issue in this lawsuit since at least March 4, 2003.

### Clarkstown Facility

117.    Defendant owns and/or operates the Clarkstown Facility, a transfer station, yard waste processing, and concrete and asphalt crushing and screening facility.

118.    Industrial activities at the Clarkstown Facility include the receipt of solid waste, yard waste, concrete, and asphalt; the transfer of solid waste for offsite disposal; the processing of yard waste into mulch; and the crushing and screening of concrete and asphalt for reuse.

119.    Industrial activities at the Facility are categorized within SIC Codes 5093 (Scrap and Waste Materials) and 2499 (Wood Products, Not Elsewhere Classified), which are subject to the MSGP's effluent limits for Sectors N (Subsector N-3) and A, respectively.

120.    As a Sector N (Subsector N3) and A facility, the Clarkstown Facility must comply with all of the MSGP's universal requirements, all requirements that apply to every Sector N facility, all requirements that apply to every Subsector N3 facility, and all requirements that apply to every Sector A facility.

121.    The Clarkstown Facility collects and discharges stormwater from its 17.34-acre industrial site through at least five discharge locations.

122.    Defendant has certified that the receiving waters for stormwater discharges from the Clarkstown Facility are minor tributaries to the Hackensack River, which flows to Newark Bay at the Passaic-Hackensack River Delta.

123.    DEC has classified the portion of the Hackensack River and its tributaries where the Clarkstown Facility discharges stormwater as a Class C water. 6 NYCRR § 865.6, tbl.I, no.60. The Hackensack River and its tributaries are waters of the United States.

<u>French Farms Facility</u>

124.     Defendant owns and/or operates the French Farms Facility, a yard waste composting facility.

125.    Industrial activities at the French Farms Facility include the receipt of yard waste and the processing of organic waste into compost.

126.    Industrial activities at the French Farms Facility are categorized within SIC Code 2875 (Fertilizers, Mixing Only), which are subject to the MSGP's effluent limits for Sector C.

127.    As a Sector C facility, the French Farms Facility must comply with all of the MSGP's universal requirements and all requirements that apply to every Sector C facility.

128.    The French Farms Facility collects and discharges stormwater from its 4.37-acre industrial site through at least two discharge locations.

129.    Defendant has certified that the receiving water for stormwater discharges from the French Farms Facility are minor tributaries to DeForest Lake, an impounded portion of the Hackensack River, which flows to Newark Bay at the Passaic-Hackensack River Delta.

130.    DEC has classified DeForest Lake and its tributaries where the French Farms Facility discharges stormwater as a Class A water. 6 NYCRR § 865.6, tbl.I, no.7. The tributaries, DeForest Lake, and the Hackensack River are waters of the United States.

Hillburn Facility

131.    Defendant owns and/or operates the Hillburn Facility, a waste receiving and transferring, recyclable sorting, and composting facility.

132.    Industrial activities at the Hillburn Facility include the receipt of solid waste, source-separated recyclables, and biosolids; the transfer of solid waste for offsite disposal; the sorting of recyclables for offsite reuse; and the composting of biosolids.

133.    Industrial activities at the Hillburn Facility are categorized within SIC Codes 5093 (Scrap and Waste Materials) and 2875 (Fertilizers, Mixing Only), which are subject to the MSGP's effluent limits for industrial Sectors N (Subsectors N-1 and N-3) and C, respectively.

134.    As a Sector N (Subsectors N-1 and N-3) and C facility, the Hillburn Facility must comply with all of the MSGP's universal requirements, all requirements that apply to every Sector N facility, all requirements that apply to every Subsector N-1 facility, all requirements that apply to every Subsector N-3 facility, and all requirements that apply to every Sector C facility.

135.    The Hillburn Facility collects and discharges stormwater from its 13.08-acre industrial site through at least five discharge locations.

136.    Defendant has certified that the receiving water for stormwater discharges from the Hillburn Facility is Torne Brook. Stormwater discharges leaving the facility initially enter the Town of Ramapo MS4 and other stormwater conveyances, which flow to Torne Brook. Torne Brook flows to the Ramapo River, which flows to the Pompton River, which flows to the Passaic River, which flows to Newark Bay at the Passaic-Hackensack River Delta.

137.    The DEC has classified the Torne Brook where the Hillburn Facility discharges stormwater as a Class B waterbody. 6 NYCRR § 860.4, tbl.1, no.25. These waterbodies, from

Torne Brook to Newark Bay, are all waters of the United States.

<u>West Haverstraw Facility</u>

138.    Defendant owns and/or operates the West Haverstraw Facility, a waste receiving and transferring facility.

139.    Industrial activities at the West Haverstraw Facility include the receipt of solid waste and the transfer of solid waste for offsite disposal.

140.    Industrial activities at the West Haverstraw Facility are categorized within SIC Code 5093 (Scrap and Waste Materials), which are subject to the MSGP's effluent limits for Sector N (Subsector N3).

141.    As a Sector N (Subsector N3) facility, the French Farms Facility must comply with all of the MSGP's universal requirements, all requirements that apply to every Sector N facility, and all requirements that apply to every Subsector N3 facility.

142.    The West Haverstraw Facility collects and discharges stormwater from its 1.15-acre industrial site through at least two discharge locations.

143.    Defendant has certified that the receiving water for stormwater discharges from the West Haverstraw Facility is Cedar Pond Brook. Stormwater discharges leaving the facility enter marshlands known as Cedar Pond Brook, classified as part of the Hudson River.

144.    The DEC has classified the portion of the Hudson River where the West Haverstraw Facility discharges stormwater as a Class SB water. 6 NYCRR § 864.6, tbl.I, no.2. Cedar Pond Brook and its associated marshlands flow to the Hudson River and are waters of the United States.

<u>Industrial Stormwater at the Facilities</u>

145.    When it rains, the majority of stormwater from the Facilities comes from, or is

commingled with runoff from, areas at the Facilities where industrial processes occur (including the roofs of buildings at the Facilities).

146.    Stormwater flowing over areas of the Facilities that are associated with Defendant's industrial activities collects a variety of pollutants, including but not limited to sizeable debris, sediment, oil and grease, metals, organic substances and other chemicals that create chemical oxygen demand, and other pollutants.

### Defendant's NPDES Permit Coverage

147.    On March 4, 2003, Defendant first submitted a Notice of Intent ("NOI") to obtain coverage for the Facilities under the MS4 Permit.

148.    The Facilities operated pursuant to the operable version of the MS4 Permit until Defendant obtained coverage for the Facilities under the MSGP. As outlined above, each version of the MS4 Permit required compliance with elements of the MSGP.

149.    On February 20, 2024, Defendant submitted an NOI for coverage under the MSGP for stormwater discharges from each of Defendant's Facilities.

150.    On March 26, 2024, Defendant obtained MSGP coverage for the Hillburn Facility. On March 28, 2024, Defendant obtained MSGP coverage for the Clarkstown Facility and the West Haverstraw Facility. On April 7, 2024, Defendant obtained MSGP coverage for the French Farms Facility.

      a.    The Clarkstown Facility discharges under Permit ID No. NYR00G954.

      b.    The French Farms Facility discharges under Permit ID No. NYR00G958.

      c.    The Hillburn Facility discharges under Permit ID No. NYR00G952.

      d.     The West Haverstraw Facility discharges under Permit ID No. NYR00G953.

151.    Defendant's MSGP coverage for the Facilities thus continued its existing

obligation as set forth in the MS4 Permit to comply with the aforementioned provisions of the MSGP to implement SWPPPs, conduct inspections, conduct benchmark monitoring, and comply with technology based effluent limitations.

**Defendant Discharges Excessively Polluted Stormwater**

152.    Defendant has periodically taken samples or arranged for samples to be taken of stormwater discharges from the Facilities.

153.    Defendant submitted some of these samples for laboratory analysis. The sample results were either reported to the DEC on written discharge monitoring reports or to the EPA and DEC jointly through EPA's electronic system for submission of discharge monitoring reports online. Defendant certified each of those reports pursuant to the MSGP.

154.    Defendant monitored some of these samples for visible indicators of pollution and recorded the results on standard MSGP monitoring forms provided by DEC ("Quarterly Visual Monitoring Form," known as "QVMs").

Benchmark Exceedances

155.    In stormwater sampling results, each of the Defendant's Facilities have consistently reported high pollutant levels that exceed applicable benchmarks and are evidence of ongoing violations of the effluent limitations set forth in the MSGP.

156.    In the past five years, Defendant has reported numerous discharges of stormwater from the Clarkstown Facility that exceeded the MSGP's benchmarks for COD, TSS, O&G, aluminum, copper, iron, lead, and zinc. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl. 1, and are incorporated herein by reference.

157.    In the past five years, Defendant has reported numerous discharges of stormwater from the French Farms Facility that exceeded the MSGP's benchmarks for iron, zinc, nitrogen,

and phosphorus. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl. 2, and are incorporated herein by reference.

158.    In the past five years, Defendant has reported numerous discharges of stormwater from the Hillburn Facility that exceeded the MSGP's benchmarks for COD, TSS, nitrogen, aluminum, copper, iron, lead, and zinc. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl. 3, and are incorporated herein by reference.

159.    In the past five years, Defendant has reported numerous discharges of stormwater from the West Haverstraw Facility that exceeded the MSGP's benchmarks for COD, TSS, O&G, aluminum, copper, iron, lead, and zinc. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl. 4, and are incorporated herein by reference.

<u>Visual Monitoring</u>

160.    In the past five years, Defendant has documented numerous stormwater discharges from the Clarkstown Facility that contained indicators of pollution, including odor, color, and particulates. Further details related to these observations, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl. 5, and are incorporated herein by reference.

161.    In the past five years, Defendant has documented numerous stormwater discharges from the French Farms Facility that contained indicators of pollution, including odor and color. Further details related to these observations, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl. 6, and are incorporated herein by

reference.

162.    In the past five years, Defendant has documented numerous stormwater discharges from the Hillburn Facility that contained indicators of pollution, including odor, color, and particulates. Further details related to these observations, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl. 7, and are incorporated herein by reference.

163.    In the past five years, Defendant has documented numerous stormwater discharges from the French Farms Facility that contained indicators of pollution, including odor and tint. Further details related to these observations, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl. 8, and are incorporated herein by reference.

<u>Water Quality Standard Exceedances</u>

164.    Plaintiffs allege that the Defendant's Facilities' stormwater discharges—with consistently high pollutant levels, as described above—are causing, have the reasonable potential to cause, or are contributing to violations of applicable New York water quality standards.

165.    During the past five years, Defendant has reported numerous discharges of stormwater from the Clarkstown Facility that exceeded applicable New York water quality standards for Class A waters, including copper (A(A)), iron (A(WS)), lead (A(A) and H(WS)), and zinc (A(A)). Defendant has also reported discharges of COD from the Clarkstown Facility that exceeded applicable water quality standards for dissolved oxygen in the Hackensack River. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl.1, and are incorporated herein by reference.

166.    During the past five years, Defendant has reported numerous visual observations

of stormwater discharges from the Clarkstown Facility's stormwater discharges that contravene applicable narrative water quality standards for Taste/Color/Odor, Suspended Solids, and Oil and Floating. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl.5, and are incorporated herein by reference.

167.    During the past five years, Defendant has reported numerous discharges of stormwater from the French Farms Facility that exceeded applicable New York water quality standards for Class A waters, including iron (A(WS)) and zinc (A(A)). Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl.2, and are incorporated herein by reference.

168.    During the past five years, Defendant has reported numerous visual observations of stormwater discharges from the French Farms Facility's stormwater discharges that contravene applicable narrative water quality standards for Taste/Color/Odor, Suspended Solids, and Oil and Floating. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl.6, and are incorporated herein by reference.

169.    During the past five years, Defendant has reported numerous discharges of stormwater from the Hillburn Facility that exceeded applicable New York water quality standards for Class A waters, including copper (A(A)), iron (A(WS)), lead (A(A) and H(WS)), and zinc (A(A)). Defendant has also reported discharges of COD that exceeded applicable water quality standards for dissolved oxygen in the Ramapo River. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl.3, and are incorporated herein by reference.

170.    During the past five years, Defendant has reported numerous visual observations of stormwater discharges from the Hillburn Facility's stormwater discharges that contravene applicable narrative water quality standards for Taste/Color/Odor, Suspended Solids, and Oil and Floating. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl.7, and are incorporated herein by reference.

171.    During the past five years, Defendant has reported numerous discharges of stormwater from the West Haverstraw Facility that exceeded applicable New York water quality standards for Class SB waters, including copper (A(A)). Defendant has also reported discharges of COD that exceeded applicable water quality standards for dissolved oxygen in the Hudson River. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl.4, and are incorporated herein by reference.

172.    During the past five years, Defendant has reported numerous visual observations of stormwater discharges from the West Haverstraw Facility's stormwater discharges that contravene applicable narrative water quality standards for Taste/Color/Odor, Suspended Solids, and Oil and Floating. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Plaintiffs' Notice Letter, Ex. A, tbl.8, and are incorporated herein by reference.

173.    On information and belief, Defendant's discharges of stormwater containing pollutants that exceed numerical water quality standards are causing, have the reasonable potential to cause, or are contributing to violations of water quality standards.

174.    On information belief, Defendant's discharges of stormwater containing visible

pollutants that contravene narrative water quality standards are causing, have the reasonable potential to cause, or are contributing to violations of water quality standards.

### Defendant's Inadequate Stormwater and Pollution Management Practices

175.    On information and belief, Plaintiffs allege that there are insufficient stormwater control measures and inadequate BMPs installed at the Defendant's Facilities.

176.    Plaintiffs are informed and believe, and thereupon allege, that stormwater management practices at the Facilities are inadequate to minimize pollution in industrial stormwater discharged to waters of the United States. The Facilities lack sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent precipitation and stormwater flows from coming into contact with exposed areas of contaminants. The Facilities lack sufficient structural controls to prevent the discharge of water once contaminated. The Facilities lack adequate stormwater pollution treatment technologies to treat stormwater once contaminated.

177.    On information and belief, Plaintiffs allege that Defendant has failed and is continuing to fail to implement pollution controls equivalent to the BAT/BCT Standard at the Facilities for their discharges of industrial stormwater containing COD, TSS, O&G, aluminum, copper, iron, lead, zinc, nitrogen, phosphorus, and other pollutants.

178.    Furthermore, Plaintiffs are informed and believe, and thereupon allege, that Defendant has failed to adequately implement the following generally-applicable mandatory BMPs at each of the Facilities, in violation of the MSGP: (1) minimize the exposure of industrial areas to stormwater and stormwater runoff; (2) good housekeeping (e.g., sweeping regularly, appropriate storage in closed containers, etc.); (3) minimize onsite erosion and sedimentation; (4) divert, contain, and otherwise reduce all stormwater discharges from the facility; (5) train all employees, at least annually, in appropriate stormwater control and SWPPP implementation;

(6) eliminate non-stormwater discharges; and (7) "minimize generation of dust and off-site tracking of raw, final, or waste materials." MSGP, Parts II.A.1, 2, 5, 6, 8, 9, 11.

179.    The failure to implement adequate stormwater controls, BMPs, and management practices is evidenced by the systemic exceedances of benchmarks at all of Defendant's facilities, consistent visual monitoring reports of stormwater discharges at all of Defendant's facilities that contain visible pollution, and analytical and visual monitoring of stormwater that exceed or contravene New York State water quality standards. *See supra*, ¶¶ 152–74.

### Defendant's Failure to Take Corrective Actions

180.    On information and belief, Plaintiffs allege that Defendant has failed to implement sufficient corrective actions at the Defendant's Facilities.

181.    Defendant has been required to take corrective action following each semi-annual exceedance of benchmarks at each Facility for well over five years. Based on continuing and ongoing exceedances of benchmarks at each Facility, Plaintiffs are informed and believed, and thereupon allege, that Defendant failed to take such corrective actions.

182.    Defendant has been required to take corrective action following each quarterly observation of stormwater discharges containing visible pollutants at each Facility for well over five years. Based on continuing and ongoing reports of visible pollution at each Facility, Plaintiffs are informed and believe, and thereupon allege, that Defendant failed to take such corrective actions.

183.    Defendant has been required to take corrective action following each quarterly or semi-annual report of stormwater discharges containing pollution that exceed or otherwise contravene New York State water quality standards at each Facility for well over five years. Based on continuing and ongoing reports of stormwater discharges containing such pollution at each Facility, Plaintiffs are informed and believe, and thereupon allege, that Defendant has failed

to take such corrective actions.

184.    The failure to implement adequate corrective actions is evidenced by the systemic exceedances of benchmarks at all of Defendant's facilities, consistent visual monitoring reports of stormwater discharges at all of Defendant's facilities that contain visible pollution, and analytical and visual monitoring of stormwater that exceed or contravene New York State water quality standards. *See supra*, ¶¶ 152–74.

**Defendant's Inadequate Stormwater Pollution Prevention Plans**

185.    As discussed above, the MSGP requires permittees, including Defendant, to develop and implement an adequate SWPPP that meets certain requirements and documents all BMPs used to minimize the exposure of pollution to stormwater.

186.    Each of the Facilities' SWPPPs is inadequate, in that the BMPs used to minimize the exposure of pollution to stormwater at each Facility are inadequate. *See supra*, ¶¶ 175–79.

187.    Defendant has failed to amend each of the Facilities' SWPPPs in response to stormwater monitoring showing continuing exceedances of benchmarks demonstrating that each of the Facilities' BMPs are ineffective. *See supra*, ¶¶ 175–79.

188.    Each of the Facilities' SWPPPs entirely fail to describe the generally-applicable BMPs selected to eliminate discharges of solid material, to minimize off-site vehicle tracking, to control erosion, and to manage the flow of stormwater.

189.    Plaintiffs further allege that Defendant has failed to implement adequate SWPPPs for each of the Defendant's Facilities, as follows.

Clarkstown Facility SWPPP Violations

190.    The Clarkstown Facility's SWPPP site map fails to show fueling stations or loading/unloading areas.  The site map also fails to identify the location of potential sources of pollution described elsewhere in the SWPPP with respect to fueling and material handling. The

site map also fails to identify locations required under Sector A (the wood processing area) and Sector N (the scrap and waste material storage areas).

191.    The Clarkstown Facility's SWPPP fails to include a number of sector-specific BMPs and SWPPP requirements as set forth in Part VII of the MSGP for Sectors A and N-3 or, alternatively, fails to include an explanation of why those BMPs are not appropriate.

192.    As to Sector A, the SWPPP fails to detail structural and vegetative measures that will be used to control erosion and sedimentation.

193.    As to Sector N, the SWPPP fails to address and document considerations of the required BMPs for good housekeeping measures for particulate matter; fails to mention floor drains or liquid wastes; and fails to provide for immediate containment and cleanup of spills/leaks, specify cleanup procedures related to the use of dry absorbents, and document a consideration of overfill protection devices.

194.    As to Subsector N3, the SWPPP fails to set forth an inbound recyclable & waste control program, including educational information for suppliers, procedures for certifying suppliers followed the program, and procedures for inspecting inbound materials; and fails to include or document consideration of specified BMPs for processing areas.

<u>French Farms Facility SWPPP Violations</u>

195.    The French Farms Facility's SWPPP fails to include reference to the unauthorized non-stormwater discharge that occurred at SMP-002 on August 2, 2023.

196.    Defendant has failed to update the French Farms Facility's SWPPP to identify new BMPs to prevent the recurrence of the unauthorized non-storm water discharge.

197.    Defendant failed to document in the SWPPP the required actions to notify the DEC Regional Waste Manager of the unauthorized non-stormwater discharge and to begin

immediate actions to eliminate the discharge.

198.    The French Farms Facility's SWPPP site map for the French Farms Facility fails to show loading/unloading areas. The site map also fails to identify the location of potential sources of pollution described elsewhere in the SWPPP with respect to vehicle traffic and material handling.

199.    The French Farms Facility's SWPPP fails to include a sector-specific BMP and SWPPP requirement as set forth in Part VII of the MSGP for Sector C or, alternatively, fails to include an explanation of why that BMP is not appropriate.

200.    The SWPPP fails to set forth a schedule for regular pickup and disposal of waste materials, or to adopt alternative measures that will reduce discharges of stormwater that has come into contact with such material.

<u>Hillburn Facility SWPPP Violations</u>

201.    The Hillburn Facility's SWPPP site map fails to show fueling stations or loading/unloading areas. The site map also fails to identify the location of potential sources of pollution described elsewhere in the SWPPP with respect to vehicle traffic and material handling. The site map also fails to identify locations required under Sector C (the processing and storage area) and Sector N (the scrap and waste material storage areas and where materials and sorted, transferred, and stockpiled).

202.    The Hillburn Facility's SWPPP fails to include a sector-specific BMPs and SWPPP requirements as set forth in Part VII of the MSGP for Sectors C and N (Subsectors N-1 and N-3) or, alternatively, fails to include an explanation of why those BMPs are not appropriate.

203.    As to Sector C, the SWPPP fails to include a description of the processing and storage area and fails to set forth a schedule for regular pickup and disposal of waste materials,

or to adopt alternative measures that will reduce discharges of stormwater that has come into contact with such material.

204.    As to Sector N, the SWPPP fails to address and document considerations of the required BMPs for good housekeeping measures for particulate matter; fails to include or consider required BMPs for stockpiled materials, processed materials, and non-recyclable wastes; fails to mention floor drains or liquid wastes; and fails to provide for immediate containment and cleanup of spills/leaks, specify cleanup procedures related to the use of dry absorbents, and document a consideration of overfill protection devices.

205.    As to Subsector N-1, the SWPPP entirely fails to mention drop off containers, let alone describe enhanced measures to prevent discharge or adequately monitor discharges as required by the MSGP.

206.    As to Subsector N-3, the SWPPP fails to set forth an inbound recyclable & waste control program, including educational information for suppliers, procedures for certifying suppliers followed the program, and procedures for inspecting inbound materials; and fails to include or document consideration of specified BMPs for processing areas.

<u>West Haverstraw Facility SWPPP Violations</u>

207.    The West Haverstraw Facility's SWPPP fails to include reference to the unauthorized non-storm water discharges that occurred at SMP-001 on June 30, 2022; May 31, 2023; and July 26, 2023.

208.    Defendant has failed to update the West Haverstraw Facility's SWPPP to identify new BMPs to prevent the recurrence of the unauthorized non-storm water discharges.

209.    Defendant failed to document in the SWPPP the required actions to notify the DEC Regional Waste Manager of the unauthorized non-stormwater discharges and to begin

immediate actions to eliminate the discharges.

210.    The West Haverstraw Facility's SWPPP site map fails to show loading/unloading areas or storage areas. The site map also fails to identify the location of potential sources of pollution described elsewhere in the SWPPP with respect to vehicle traffic, material handling, and trailer storage. The site map also fails to identify locations required under Sector N (the scrap and waste material storage areas and where materials and sorted, transferred, and stockpiled).

211.    The West Haverstraw Facility's SWPPP fails to include a number of sector-specific BMPs and SWPPP requirements as set forth in Part VII of the MSGP for Sector N (Subsector N-3) or, alternatively, fails to include an explanation of why those BMPs are not appropriate.

212.    As to Sector N, the SWPPP fails to address and document considerations of the required BMPs for good housekeeping measures for particulate matter; fails to include or consider required BMPs for stockpiled materials, processed materials, and non-recyclable wastes; fails to mention floor drains or liquid wastes; and fails to provide for immediate containment and cleanup of spills/leaks, specify cleanup procedures related to the use of dry absorbents, and document a consideration of overfill protection devices.

213.    As to Subsector N-3, the SWPPP fails to set forth an inbound recyclable & waste control program, including educational information for suppliers, procedures for certifying suppliers followed the program, and procedures for inspecting inbound materials; and fails to include or document consideration of specified BMPs for processing areas.

<u>**Defendant's Inadequate Monitoring Practices**</u>

214.    As discussed above, the MSGP requires permittees, including Defendant, to regularly monitor stormwater discharges and to submit accurate reports to DEC.

215.    Defendant has failed to collect and obtain analytical monitoring of discharges from each outfall at each Facility on a semi-annual basis, despite conducting visual monitoring on discharges from those outfalls during qualifying storm events during corresponding quarters.

216.    As to the Clarkstown Facility, Defendant failed to collect and obtain analytical monitoring of discharges at the following dates and locations, despite observing a discharge during the monitoring period:

      a.    2024, Monitoring Period 1, SMP-005;

      b.    2023, Monitoring Period 2, SMP-003;

      c.    2022, Monitoring Period 2, SMP-003;

      d.    2022, Monitoring Period 2, SMP-005; and

      e.    2021, Monitoring Period 2, SMP-003.

217.    As to the Hillburn Facility, Defendant failed to collect and obtain analytical monitoring of discharges at the following dates and locations, despite observing at least one discharge during the monitoring period:

      a.    2024, Monitoring Period 1, SMP-003;

      b.    2024, Monitoring Period 1, SMP-001;

      c.    2022, Monitoring Period 2, SMP-001;

      d.    2022, Monitoring Period 2, SMP-003;

      e.    2021, Monitoring Period 1, SMP-002;

      f.    2021, Monitoring Period 1, SMP-003; and

      g.    2021, Monitoring Period 1, SMP-004.

218.    As to the West Haverstraw Facility, Defendant failed to collect and obtain analytical monitoring of discharges at the following dates and locations, despite observing at

least one discharge during the monitoring period:

      a.      2024, Monitoring Period 1, SMP-001;

      b.      2024, Monitoring Period 1, SMP-002;

      c.      2022, Monitoring Period 1, SMP-002;

      d.      2021, Monitoring Period 1, SMP-002;

      e.      2021, Monitoring Period 2, SMP-001; and

      f.      2021, Monitoring Period 2, SMP-002.

219.    Furthermore, Plaintiffs are informed and believe, and thereupon allege, that the Clarkstown Facility discharges stormwater associated with industrial activity from a discharge location that is wholly unmonitored by Defendant. This unmonitored outfall is located at approximately the mid-point between SMP-003 and the Mulch Storage Area. This unmonitored outfall is not marked on the SWPPP map, nor is it described in the SWPPP. Defendant has failed to adequately inspect the Clarkstown Facility, as demonstrated by this unmonitored outfall.

220.    Plaintiffs accordingly allege that, as to the Clarkstown Facility's unmonitored outfall, Defendant has failed to conduct quarterly visual monitoring or semi-annual analytical monitoring for any stormwater discharge from this outfall for at least the last five years.

221.    Further detailed facts, including additional detail on specific incidents and conditions that constitute violations of the MSGP, are set forth in the Notice Letter attached hereto as Exhibit A, and are incorporated herein by reference.

# VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and Best Conventional Treatment Technologies
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

222.    Plaintiffs re-allege and incorporate all preceding paragraphs as if set forth herein.

223.    The MSGP, Part II, requires Defendant to implement mandatory general stormwater control measures and BMPs at each of Defendant's Facilities to minimize the discharge of pollutants from each Facility.

224.    The MSGP, Part VII, requires Defendant to implement mandatory sector-specific stormwater control measures and BMPs at each of Defendant's Facilities to minimize the discharge of pollutants, as follows:

   a.    As to the Clarkstown Facility, which conducts industrial activities under SIC Codes 2499 and 5093, Defendant must implement Sectors A and N (Subsector N-3);

   b.    As to the French Farms Facility, which conducts industrial activities under SIC Code 2875, Defendant must implement Sector C;

   c.    As to the Hillburn Facility, which conducts industrial activities under SIC Codes 2875 and 5093, Defendant must implement Sectors C and N (Subsectors N-1 and N-3); and

   d.    As to the West Haverstraw Facility, which conducts industrial activities under SIC Code 5093, Defendant must implement Sector N (Subsector N3).

225.    The MSGP requires that Defendant's selected pollution prevention and control measures must meet the federal BAT/BCT Standard.

226.    Plaintiffs are informed and believe, and thereupon allege, that as of the filing date of this complaint, Defendant has not implemented adequate stormwater control measures or BMPs required by the MSGP at each of Defendant's Facilities.

227.    Defendant has failed to implement control measures that meet the BAT/BCT Standard at each Facility for its discharges of stormwater associated with industrial activities containing metals, suspended solids, chemical oxygen demand, nitrogen and phosphorus, and other pollutants, in violation of Parts II and VII of the MSGP.

228.    Defendant's failure to implement sufficient BMPs that meet the BAT/BCT Standard is evidenced by, amongst other things, the systemic and continuous benchmark exceedances and reports of visibly contaminated stormwater discharges continuously flowing from each of Defendant's Facilities to waters of the United States.

229.    On information and belief, Defendant has failed to develop and implement pollution controls equivalent to the BAT/BCT Standard every day since at least June 9, 2020.

230.    Each day upon which Defendant operates the Facilities without pollution controls equivalent to the BAT/BCT Standard is a separate and distinct violation of the MSGP and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

231.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

232.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION
**Failure to Develop, Implement, and Maintain an Adequate SWPPP**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

233.    Plaintiffs re-allege and incorporate all preceding paragraphs as if set forth herein.

234.    The MSGP, Part III, requires Defendant to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP") at each industrial facility it owns and/or operates. The SWPPP must be representative of current site conditions and kept up to date. MSGP, Part III.E.

235.    The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the facility's industrial activity. The MSGP, Part VII, thus requires Defendant to develop a SWPPP for each Facility in accordance with sector-specific requirements, as follows:

    a.    As to the Clarkstown Facility, which conducts industrial activities under SIC Codes 2499 and 5093, Defendant must implement and maintain compliance with a SWPPP developed for Sectors A and N (Subsector N-3);

    b.    As to the French Farms Facility, which conducts industrial activities under SIC Code 2875, Defendant must implement and maintain compliance with a SWPPP developed for Sector C;

    c.    As to the Hillburn Facility, which conducts industrial activities under SIC Codes 2875 and 5093, Defendant must implement, and maintain compliance with a SWPPP developed for Sectors C and N (Subsectors N-1 and N-3); and

    d.    As to the West Haverstraw Facility, which conducts industrial activities under SIC Code 5093, Defendant must implement, and maintain compliance with a SWPPP developed for Sector N (Subsector N3).

236.    The SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the MSGP, including achievement of effluent limitations.

237.    Plaintiffs are informed and believe, and thereupon allege, that as of the filing date of this complaint, Defendant has failed to develop, implement, and keep up to date an adequate SWPPP for each Facility.

238.    The inadequacy of each Facility's SWPPP is evidenced by, *inter alia*, the inadequate stormwater control measures and BMPs at each Facility, the systemic and continuous benchmark exceedances at each Facility, and the visibly contaminated stormwater discharges flowing from each of Defendant's Facilities to waters of the United States.

239.    Each of Defendant's Facilities' SWPPPs violate generally applicable MSGP requirements—including, but not limited to, failure to describe the BMPs selected to eliminate discharges of solid material, to minimize off-site vehicle tracking, to control erosion, and to manage the flow of stormwater—as further detailed above.

240.    Each of Defendant's Facilities' SWPPPs also violate sector-specific MSGP requirements—including, but not limited to, failure to include (or explain the reason for not including) BMPs—as further detailed above.

241.    On information and belief, Defendant has failed to develop and implement an adequate SWPPP for the Facility every day since at least June 9, 2020.

242.    On information and belief, Defendant has failed to update the SWPPPs for the Facilities in response to the analytical results of the Facilities' stormwater monitoring.

243.    Each day upon which Defendant operates the Facility without an adequate SWPPP for the Facility is a separate and distinct violation of the MSGP and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

244.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

245.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
### Failure to Take Corrective Actions
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

246.    Plaintiffs re-allege and incorporate all preceding paragraphs as fully set forth herein.

247.    The MSGP requires Defendant to take corrective action upon, *inter alia*, learning of an effluent limit violation, benchmark exceedance, visual indication of pollution, non-stormwater discharge, or that stormwater discharges are causing, have the reasonable potential to cause, or are contributing to a violation of water quality violations. MSGP, Parts IV.A.1.b, IV.B.4, IV.C.3, IV.E.6, V. Such corrective actions must be documented. *Id.*, Part V.C.

248.    Plaintiffs are informed and believe, and thereupon allege, that as of the filing date of this complaint, Defendant has not taken adequate corrective actions to address their ongoing violations.

249.    Defendant's failure to implement adequate corrective actions is evidenced by each Facility's inadequate SWPPP, the inadequate stormwater control measures and BMPs at each Facility, the systemic and continuous benchmark exceedances at each Facility, and the visibly polluted stormwater flowing from each of Defendant's Facilities to waters of the United States.

250.    Each and every day on which Defendant fails to take corrective action following a triggering event is a separate and distinct violation of the MSGP and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

251.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

252.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### FOURTH CAUSE OF ACTION
**Failure to Monitor and Make Accurate Reports**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

253.    Plaintiffs re-allege and incorporate all preceding paragraphs as fully set forth herein.

254.    The MSGP requires Defendant to monitor discharges of industrial stormwater from each Facility and accurately report their findings to DEC. MSGP, Parts IV, VI, Apps. H.8.g, H.9. This includes submitting Annual Comprehensive Reports and Discharge Monitoring Reports to DEC. MSGP, Parts VI.A.1, 2.

255.    Plaintiffs are informed and believe, and thereupon allege, that Defendant failed to conduct analytical monitoring at each outfall at each Facility, as further detailed above.

256.    Plaintiffs are informed and believe, and thereupon allege, that Defendant is failing to conduct any analytical or visual monitoring at one outfall at the Clarkstown Facility, as further detailed above.

257.    Each and every day on which Defendant fails to comply with any of the MSGP's reporting and recordkeeping requirements is a separate and distinct violation of the MSGP and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

258.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

259.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

260.    Wherefore, Plaintiffs Hackensack Riverkeeper, Inc., and Riverkeeper, Inc., respectfully request that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.   Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendant from discharging pollutants from each Facility except as authorized by and in compliance with the MSGP;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the MSGP;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to prepare a SWPPP for each Facility and to implement procedures to regularly review and update the SWPPP, consistent with the MSGP's requirements;

f.   Order Defendant to provide Plaintiffs with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

g.   Order Defendant to pay civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1–19.4;

h.   Order Defendant to take appropriate actions to remediate the harm caused by its violations of the MSGP and the Clean Water Act, to the extent possible;

i.   Order Defendant to pay the costs of litigation, including Plaintiffs' reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

j.   Award any such other and further relief as this Court may deem appropriate.

Dated this 8th day of August, 2025          Respectfully submitted,
New York, New York

By: _Julia Muench_

Julia Muench
SUPER LAW GROUP, LLC
222 Broadway 22nd Floor
New York, NY 10038
*Attorneys for Plaintiffs*